UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

JASON PHILLIPS,

                              Plaintiff,

                                                    9:09-CV-1328
v.                                                  (GTS/RFT)

DR. LESTER WRIGHT, Former DOCCS
Deputy Comm'r and Chief Med. Officer;
DR. TIMOTHY WHALEN, DOCCS Reg'l
Med. Dir.; and DR. CARL KOENIGSMANN,
Former DOCCS Reg'l Med. Dir.,

                              Defendants.
_____

APPEARANCES:                            OF COUNSEL:

STOLL, GLICKMAN & BELLINA, LLP          CYNTHIA H. CONTI-COOK, ESQ.
   Counsel for Plaintiff
71 Nevins Street
Brooklyn, New York 11217

HON. ANDREW M. CUOMO                    CHARLES J. QUACKENBUSH, ESQ.
Attorney General for the State of New York   Assistant Attorney General
   Counsel for Defendants
The Capitol
Albany, New York 12224

GLENN T. SUDDABY, United States District Judge

## MEMORANDUM-DECISION and ORDER

Currently before the Court, in this prisoner civil rights action filed by Jason Phillips

("Plaintiff") against the three above-captioned state correctional employees ("Defendants"), is

Defendants' motion for summary judgment.  (Dkt. No. 71.)  For the reasons set forth below,

Defendants' motion is granted.

I.    **RELEVANT BACKGROUND**

A.    **Relevant Procedural History**

Because this Decision and Order is intended primarily for the review of the parties, and because the parties have demonstrated (in their memoranda of law) an accurate understanding of this action's procedural history, the Court will assume the reader's familiarity with that procedural history, from its filing on November 27, 2009, to the filing of Plaintiff's Second Amended Complaint on June 12, 2012. (*See generally* Docket Sheet.)

B.    **Allegations and Claims of Plaintiff's Second Amended Complaint**

Liberally construed, Plaintiff's Second Amended Complaint (filed with the assistance of counsel) alleges that, between September 21, 2007, and September 25, 2009, while Plaintiff was incarcerated at three correctional facilities within the New York State Department of Corrections and Community Supervision ("DOCCS"),[1] Defendants issued "blanket denials" of four recommendations (made by three facility physicians and a general surgeon) that surgery be authorized to remove a lump on Plaintiff's back,[2] based on a DOCCS policy of denying requests for lipoma surgery[3] "regardless of a patient's individual symptoms" (e.g., the lump's growth, the patient's pain, and the lump's disruption in the patient's movement and daily activities), despite

---

[1]    Between September 2007 and September 2009, Plaintiff was incarcerated at Ulster Correctional Facility, Mid-Orange Correctional Facility, and Wallkill Correctional Facility. (Dkt. No. 67, at ¶ 7.)

[2]    Plaintiff alleges that Dr. Koenigsmann issued denials on December 20, 2007, May 6, 2008, and September 15, 2008. (Dkt. No. 67, at ¶¶ 9, 54-57.) He alleges that Dr. Whalen issued a denial on March 5, 2009. (*Id*. at ¶¶ 42, 58.) He alleges that Dr. Wright was personally involved in each of these four denials. (*Id*. at ¶¶ 10, 54, 55.)

[3]    A lipoma is a "benign tumor composed chiefly of fat cells." *The American Heritage Medical Dictionary* (Rev. ed. 2007)

the fact that Plaintiff's lump (1) continued to grow from 8 x 4 centimeters in size to 15 x 11 centimeters in size, (2) caused Plaintiff constant and severe pain, (3) prevented him from sleeping at night, (4) limited his range of motion in his right arm, and (5) prevented him from standing upright.  (*See generally* Dkt. No. 67.)

Based on these factual allegations, Plaintiff claims that Defendants were deliberately indifferent to his serious medical needs, in violation of his rights under the Eighth Amendment to the United States Constitution.  (*Id*.)  For a more detailed recitation of Plaintiff's claims, and the factual allegations giving rise to those claims, the Court refers the reader to the Second Amended Complaint in its entirety.  (*Id.*)

### C.    Briefing on Defendants' Motion for Summary Judgment

#### 1.    Defendants' Memorandum of Law in Chief

Generally, in their memorandum of law in chief, Defendants argue that summary judgment should be entered in their favor for the following four alternative reasons.  (*See generally* Dkt. No. 71, Attach. 1, at 6-19 [attaching pages "6" through "19" of Defs.' Memo. of Law].)

First, argue Defendants, no rational fact finder could conclude, based on the current record, that any of the three Defendants (all of whom were supervisors) were personally involved in the constitutional violation alleged, because (a) no admissible record evidence exists that Dr. Wright was ever aware of Plaintiff or his medical care during the time in question, and the DOCCS policy on lipoma surgery that he helped develop ("DOCCS Policy 1.43") was flexible, permitting surgery if collateral symptoms or co-morbidities are presented, (b) Dr. Koenigsmann's involvement in Plaintiff's medical care was limited to making a decision

regarding surgery based on information supplied to him from clinicians on three occasions widely spaced over a period of approximately 300 days, and (c) Dr. Whalen's involvement in Plaintiff's medical care was limited to making a decision regarding surgery based on information supplied to him from clinicians on one occasion. (*Id*. at 7-9 [attaching pages "7" through "9" of Defs.' Memo. of Law].)

Second, argue Defendants, even if there were sufficient evidence of personal involvement, no rational fact finder could conclude, based on the current record, that Plaintiff experienced a sufficiently serious medical need to establish an Eighth Amendment claim, because no admissible record evidence exists (only speculation) that Plaintiff's subjective complaints of pain were ever confirmed by an objective indication of pain or mechanical interference (e.g., the location of the lipoma in a weight-bearing area or near a joint, an indication of nerve involvement in the excised tissue, etc.). (*Id*. at 10-12 [attaching pages "10" through "12" of Defs.' Memo. of Law].)

Third, argue Defendants, even if there were sufficient evidence a serious medical need, no rational fact finder could conclude, based on the current record, that Defendants acted with a sufficiently culpable mental state (i.e., obduracy and wantonness) to be liable under the Eighth Amendment, because the admissible record evidence clearly establishes that, during the two-year period in question, Plaintiff received a steady course of examinations, medications and consultations with medical specialists, supervised by medical administrators who did not inflexibly apply DOCCS Policy 1.43 but who followed (based on the objective evidence) their medical judgments, Plaintiff's disagreement with which does not support an inference of deliberate indifference, and a federal court's second-guessing of which is not permissible. (*Id*. at 12-17 [attaching pages "12" through "17" of Defs.' Memo. of Law].)

Fourth, argue Defendants, even if there were sufficient evidence of such a mental state, based on the current record, Defendants are protected from liability as a matter of law by the doctrine of qualified immunity, because (a) the right to lipoma-removal surgery based merely upon subjective complaints of pain was not clearly established during the time in question, and (b) even if that right were clearly established during the time in question,  it was nonetheless objectively reasonable, under the circumstances, for Defendants to believe that their actions did not abridge that right.  (*Id*. at 17-19 [attaching pages "17" through "19" of Defs.' Memo. of Law].)

## 2.    Plaintiff's Opposition Memorandum of Law

Generally, in his opposition memorandum of law, Plaintiff argues that summary judgment should not be entered in Defendants' favor for the following four reasons.  (Dkt. No. 73, at 17-30 [attaching pages "13" through "26" of Plf.'s Opp'n Memo. of Law].)[4]

First, argues Plaintiff, based on the current record, a rational fact finder could conclude that all three Defendants were personally involved in the constitutional violation alleged, because admissible record evidence exists that (a) Dr. Koenigsmann denied requests for Plaintiff's surgery three times, (b) Dr. Whalen denied a request for Plaintiff's surgery once, and (c) not only did Dr. Wright develop and implement the DOCCS policy that categorized lipoma-removal surgeries as cosmetic (i.e., DOCCS Policy 1.43) but he reviewed a photograph and a medical narrative of Plaintiff's condition.  (*Id*. at 20-28 [attaching pages "16" through "24" of Plf.'s Opp'n Memo. of Law].)

---

[4]    Plaintiff's counsel is advised that not only does Plaintiff's opposition memorandum of law exceed the District's page limitation on such memoranda of law (in violation of N.D.N.Y. L.R. 7.1[a][1]) but that opposition memorandum of law is not signed (in violation of Fed. R. Civ. P. 11[a][1]).  Plaintiff's counsel is respectfully reminded of her duty to comply with the District's Local Rules of Practice and the Federal Rules of Civil Procedure in the future.

Second, argues Plaintiff, based on the current record, a rational fact finder could conclude that Plaintiff experienced a sufficiently serious medical need to establish an Eighth Amendment claim based on admissible record evidence regarding (a) the continuous and extreme pain that Plaintiff experienced, (b) the location of the lump, (c) the rapid growth of the lump, (d) the lump's interference with his ability to move, and (e) the lump's interference with his ability to sleep on his back. (*Id*. at 17-20 [attaching pages "13" through "16" of Plf.'s Opp'n Memo. of Law].)

Third, argues Plaintiff, based on the current record, a rational fact finder could conclude that Defendants acted with a sufficiently culpable mental state to be liable under the Eighth Amendment, because admissible record evidence exists that Defendants' decisions were such a substantial departure from accepted professional judgments, practices, or standards as to demonstrate that Defendants did not actually base their decisions on their medical judgments. (*Id*. at 20-28 [attaching pages "16" through "24" of Plf.'s Opp'n Memo. of Law].)

Fourth, argues Plaintiff, based on the current record, Defendants are not protected from liability as a matter of law by the doctrine of qualified immunity, because (a) the case of *Brock v. Wright*, 315 F.3d 158 (2d Cir. 2003), clearly established the unconstitutionality of disqualifying prisoners' chronic moderate pain caused by conditions considered cosmetic under DOCCS Policy 1.43, and (b) Defendants were not objectively reasonable in repeatedly disregarding Plaintiff's complaints of pain without physically examining him or reviewing his medical records (other than the narratives from the consultation requests, and any attached photographs, submitted by Plaintiff's primary care providers). (*Id*. at 28-29 [attaching pages "24" and "29" of Plf.'s Opp'n Memo. of Law].)

### 3. Defendants' Reply Letter-Brief

Generally, in their reply letter-brief, Defendants elaborate on the third and fourth reasons offered by them in their memorandum in chief. (Dkt. No. 74.) More specifically, in their reply letter-brief, Defendants argue as follows: (1) essentially, Plaintiff is seeking to persuade the Court to improperly hold that Defendants were required to set aside their medical judgments (which were based on the objective facts known to them and which were confirmed by the pathology report following Plaintiff's surgery) that Plaintiff's complaints of pain for a well-known, painless condition were implausible; and (2) even if Plaintiff's surgeon had discovered an extraordinary lipoma somehow entangled in pain-transmitting nerve fibers, and even if such an unexpected discovery could be regarded as malpractice, Defendants should be granted summary judgment under a standard Eighth Amendment analysis and/or a qualified-immunity analysis. (*Id.*)

## II. GOVERNING LEGAL STANDARDS

### A. Legal Standards Governing Motions for Summary Judgment

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether a genuine dispute of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). In addition, "[the moving party] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the . . . [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986).

However, when the moving party has met this initial responsibility, the nonmoving party must come forward with specific facts showing a genuine dispute of material fact for trial.  Fed. R. Civ. P. 56(a),(c),(e).

A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the novmoving party."  *Anderson*, 477 U.S. at 248.  As a result, '[c]onclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact."  *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) [citation omitted].  As the Supreme Court has famously explained, "[The nonmoving party] must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986) (citations omitted).

As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law."  *Anderson*, 477 U.S. at 248.  "Factual disputes that are irrelevant or unnecessary will not be counted."  *Id*. [citation omitted].

Implied in the above-stated burden-shifting standard is the fact that, where a nonmoving party willfully fails to adequately respond to a motion for summary judgment, a district court has no duty to perform an independent review of the record to find proof of a factual dispute.  For this reason, this Court has often enforced Local Rule 7.1(a)(3) by deeming facts set forth in a moving party's statement to have been admitted where the nonmoving party has willfully failed to properly respond to that statement.[5]

---

[5]    Among other things, Local Rule 7.1(a)(3) requires that the nonmoving party file a response to the moving party's Statement of Material Facts, which admits or denies each of the moving party's factual assertions in matching numbered paragraphs, and supports any denials with a specific citation to the record where the factual issue arises.  N.D.N.Y. L. R. 7.1(a)(3).

### B.    Legal Standards Governing Plaintiff's Claims and Defendants' Defenses

Again, because this Decision and Order is intended primarily for the review of the

parties, and because the parties have demonstrated (in their memoranda of law) an accurate

understanding of the well-known legal standards governing Plaintiff's Eighth Amendment

claims, and Defendants' defenses of lack of personal involvement and qualified immunity, the

Court will assume the reader's familiarity with those legal standards.  (*See generally* Dkt. No.

71, Attach. 1 [Defs.' Memo. of Law]; Dkt. No. 73 [Plf.'s Opp'n Memo. of Law]; Dkt. No. 74

[Defs.' Reply Letter-Brief].)

## III.    UNDISPUTED MATERIAL FACTS

Generally, unless otherwise indicated in a footnote, the following material facts have

been asserted and supported by Defendants' in their Local Rule 7.1 Statement of Undisputed

Material Facts, and expressly admitted by Plaintiff in his Local Rule 7.1 Response.[6]

### A.    Dr. Koenigsmann's Denial of First Three Requests for Surgery

Plaintiff is a former New York State prisoner.  From July of 2006, to April of 2011, he

served a six-year sentence.  On or about November 2, 2007, at Ulster Correctional Facility,

---

[6]    The Court notes that, attached to Plaintiff's Local Rule 7.1 Response is a
"supplement[al]" statement of additional material facts that Plaintiff apparently contends are *not*
in dispute.  (Dkt. No. 73, Attach. 1, at 10-16.)  Neither Fed. R. Civ. P. 56 nor Local Rule 7.1
provides a mechanism for the filing of such a statement.  Rather, Local Rule 7.1 (like the local
rules of many federal district courts across the country) provides a mechanism for the filing of
merely a separate statement of "additional material facts that the non-movant contends *are* in
dispute."  N.D.N.Y. L.R. 7.1(a)(3) [emphasis added].  If Plaintiff wished to establish a statement
of undisputed material facts, he should have filed a cross-motion for summary judgment, which
he did not do; rather, the sole motion pending before the Court is Defendants' motion for
summary judgment, of which they are the masters.  The Court exercises its sound discretion to
decline to *sua sponte* scour the lengthy record in this case to determine if the numerous facts
stated in the 34 paragraphs of Plaintiff's "supplement[al]" statement are *un*disputed.  Rather, the
Court considers Plaintiff's "supplement[al]" statement as a statement of additional material facts
that the non-movant contends are in dispute, in accordance with N.D.N.Y. L.R. 7.1(a)(3).

Plaintiff spoke with Dr. Jesus Floresca, MD, about a growth protruding on the plane of Plaintiff's back, next to his right scapula.[7] Dr. Floresca determined that Plaintiff had a benign subcutaneous fatty lipoma.[8]

A lipoma is a benign, fatty cyst which commonly grows directly under the skin, above muscular and skeletal structures, without involvement into nerves or other surrounding tissues.[9] Lipomas are common and familiar to professional clinicians.[10] They are benign and painless when not located in a joint or acute pressure point.[11]

Dr. Floresca arranged to have Plaintiff examined by a private surgical consultant, who confirmed that the growth was a lipoma, and recommended that it be removed.[12] In December of

---

[7]      (*Compare* Dkt. No. 71, Attach. 2, at ¶ 3 [Defs.' Rule 7.1 Statement, asserting fact and supporting assertion with accurate record citations] *with* Dkt. No. 73, Attach. 1, at ¶ 3 [Plf.'s Rule 7.1 Response, admitting fact then improperly attempting to "add" additional facts, which belong in a *separate* statement of "additional material facts that the non-movant contends are in dispute," pursuant to N.D.N.Y. L.R. 7.1(a)(3)].)

[8]      (*Id.*)

[9]      (*Compare* Dkt. No. 71, Attach. 2, at ¶ 2 [Defs.' Rule 7.1 Statement, asserting fact and supporting assertion with accurate record citations] *with* Dkt. No. 73, Attach. 1, at ¶ 2 [Plf.'s Rule 7.1 Response, admitting fact then improperly attempting to "add" additional facts, which belong in a *separate* statement of "additional material facts that the non-movant contends are in dispute," pursuant to N.D.N.Y. L.R. 7.1(a)(3)].)

[10]      (*Id.*)

[11]      (*Id.*)

[12]      (*Compare* Dkt. No. 71, Attach. 2, at ¶ 3 [Defs.' Rule 7.1 Statement, asserting fact and supporting assertion with accurate record citations] *with* Dkt. No. 73, Attach. 1, at ¶ 3 [Plf.'s Rule 7.1 Response, admitting fact then improperly attempting to "add" additional facts, which belong in a *separate* statement of "additional material facts that the non-movant contends are in dispute," pursuant to N.D.N.Y. L.R. 7.1(a)(3)].)

2007, the surgery request was reviewed and denied by Dr. Carl Koenigsmann, MD.[13]

On or about March 6, 2008 at Orange Correctional Facility, Plaintiff told a sick call nurse that his lipoma was causing pain.[14] On March 21, 2008, Dr. Gaetan Zamilus, MD, met with Plaintiff's and recorded his subjective complaint.[15]  Dr. Zamilus submitted a request for a surgical consultation, which Dr. Koenigsmann reviewed and denied in May of 2008.[16]

In September of 2008 at Orange Correctional Facility, Plaintiff told nurses that his lipoma was causing him pain and interfering with his ability to sleep.[17] On or about September 12, 2008, Dr. Zamilus met with Plaintiff, recorded his subjective complaints and submitted another surgical request, which Dr. Koenigsmann reviewed and denied.[18]

During the three occasions on which Dr. Koenigsmann reviewed and denied surgical consult requests regarding Plaintiff's lipoma, Dr. Koenigsmann believed–based on the nature and location of Plaintiff's lipoma–that the lipoma was not causing Plaintiff significant pain,

---

[13]  (*Id*.)

[14]  (*Compare* Dkt. No. 71, Attach. 2, at ¶ 4 [Defs.' Rule 7.1 Statement, asserting fact and supporting assertion with accurate record citations] *with* Dkt. No. 73, Attach. 1, at ¶ 4 [Plf.'s Rule 7.1 Response, admitting fact then improperly attempting to "add" additional facts, which belong in a *separate* statement of "additional material facts that the non-movant contends are in dispute," pursuant to N.D.N.Y. L.R. 7.1(a)(3)].)

[15]  (*Id*.)

[16]  (*Id*.)

[17]  (*Compare* Dkt. No. 71, Attach. 2, at ¶ 5 [Defs.' Rule 7.1 Statement, asserting fact and supporting assertion with accurate record citations] *with* Dkt. No. 73, Attach. 1, at ¶ 5 [Plf.'s Rule 7.1 Response, admitting fact then improperly attempting to "add" additional facts, which belong in a *separate* statement of "additional material facts that the non-movant contends are in dispute," pursuant to N.D.N.Y. L.R. 7.1(a)(3)].)

[18]  (*Id*.)

difficulty sleeping or difficulty moving.[19]  While it is unlikely that during this time period Dr.

Lester Wright, MD, was aware of Plaintiff, his medical treatment or any deliberations/decisions

upon his first three requests for lipoma surgery, it is possible that he was aware of those things.[20]

During his multiple examinations of Plaintiff at Mid-Orange Correctional Facility in

2008, Dr. Zamilus observed no vital signs (e.g., high blood pressure, elevated pulse) or

appearance (e.g., facial expressions such as grimacing, etc.) supporting Plaintiff's complaints of

pain regarding his lipoma.[21]

### B.    Dr. Whalen's Denial of Fourth Request for Surgery

On or about February 26, 2009, at Wallkill Correctional Facility, Plaintiff was examined

by Nurse Practitioner Stan Dashowitz, who recorded that the lipoma seemed to be growing and

that the Plaintiff was taking pain medications.[22] Mr. Dashowitz submitted a surgical request,

---

[19]    (*Compare* Dkt. No. 71, Attach. 2, at ¶¶ 8-9 [Defs.' Rule 7.1 Statement, citing record evidence that establishes the fact in question] *with* Dkt. No. 73, Attach. 1, at ¶¶ 8-9 [Plf.'s Rule 7.1 Response, not specifically denying the fact in question, and in any event referring to paragraphs citing record evidence that establishes the fact in question].)

[20]    (*Compare* Dkt. No. 71, Attach. 2, at ¶ 7 [Defs.' Rule 7.1 Statement, citing record evidence that establishes the fact in question] *with* Dkt. No. 73, Attach. 1, at ¶ 7 [Plf.'s Rule 7.1 Response, citing record evidence that establishes the fact in question].)

[21]    (*Compare* Dkt. No. 71, Attach. 2, at ¶ 12 [Defs.' Rule 7.1 Statement, citing record evidence that establishes the fact in question] *with* Dkt. No. 73, Attach. 1, at ¶ 12 [Plf.'s Rule 7.1 Response, not specifically denying the fact in question, and in any event citing record evidence that establishes the fact in question].)

[22]    (*Compare* Dkt. No. 71, Attach. 2, at ¶ 6 [Defs.' Rule 7.1 Statement, asserting fact and supporting assertion with accurate record citations] *with* Dkt. No. 73, Attach. 1, at ¶ 6 [Plf.'s Rule 7.1 Response, admitting fact then improperly attempting to "add" additional facts, which belong in a *separate* statement of "additional material facts that the non-movant contends are in dispute," pursuant to N.D.N.Y. L.R. 7.1(a)(3)].)

which Dr. Whalen reviewed and denied in March of 2009.[23]

During the occasion on which Dr. Whalen reviewed and denied the surgical request regarding Plaintiff's lipoma, Dr. Whalen believed–based on the nature and location of Plaintiff's lipoma–that the lipoma was not causing Plaintiff significant pain, difficulty sleeping or difficulty moving.[24]  While it is unlikely that during this time period Dr. Lester Wright, MD, was aware of Plaintiff, his medical treatment or any deliberations/decisions upon his fourth request for lipoma surgery, it is possible that he was aware of those things.[25]

During her multiple examinations of Plaintiff's medical records and her one examination of Plaintiff at Wallkill Correctional Facility in 2009, Dr. Susan Mueller, MD, observed no objective reason to believe that Plaintiff was in serious pain due to his lipoma (although she prescribed him naproxen in October of 2008 when she learned from a nurse that he had complained of pain, and she prescribed him Feldene on August of 2009 when he reported that the naproxen was no longer effective).[26]

---

[23]     (*Id.*)

[24]     (*Compare* Dkt. No. 71, Attach. 2, at ¶¶ 10-11 [Defs.' Rule 7.1 Statement, citing record evidence that establishes the fact in question] *with* Dkt. No. 73, Attach. 1, at ¶¶ 10-11 [Plf.'s Rule 7.1 Response, not specifically denying the fact in question, and in any event referring to paragraphs citing record evidence that establishes the fact in question].)

[25]     (*Compare* Dkt. No. 71, Attach. 2, at ¶ 7 [Defs.' Rule 7.1 Statement, citing record evidence that establishes the fact in question] *with* Dkt. No. 73, Attach. 1, at ¶ 7 [Plf.'s Rule 7.1 Response, citing record evidence that establishes the fact in question].)

[26]     (*Compare* Dkt. No. 71, Attach. 2, at ¶ 13 [Defs.' Rule 7.1 Statement, citing record evidence that establishes the fact in question] *with* Dkt. No. 73, Attach. 1, at ¶ 13 [Plf.'s Rule 7.1 Response, not specifically denying the fact in question, and in any event citing record evidence that establishes the fact in question].)

C.    Dr. Whalen's Grant of Fifth Request for Surgery

In August of 2009, Dr. Whalen received from Dr. Mueller a referral for exploratory surgery for a potential liposarcoma, in which, for the first time, a physician raised the possibility that Plaintiff's growth was cancerous.[27]  Liposarcomas are extremely rare and the risk of Plaintiff's growth being cancerous was remote.  Although the chance of a liposarcoma was remote, Dr. Whalen accepted Dr. Mueller's concern and approved surgery for Plaintiff forthwith.

On or about August 24, 2009, Dr. Todd Beyer, MD, a surgeon with Albany Medical Center, met with Plaintiff and performed a pre-surgical physical examination.[28]  Dr. Beyer's notes from the examination contain no notation that he found any objective indication of tenderness upon the application of pressure to Plaintiff's lipoma, which is a notation that would typically included in his notes had he found such tenderness.[29]

On or about September 25, 2009, Plaintiff was brought by DOCCS to Albany Medical Center, where Dr. Beyer performed a surgical excision.[30]  Dr. Beyer's operation report states,

---

[27]    (*Compare* Dkt. No. 71, Attach. 2, at ¶ 15 [Defs.' Rule 7.1 Statement, citing record evidence that establishes the fact in question] *with* Dkt. No. 73, Attach. 1, at ¶ 15 [Plf.'s Rule 7.1 Response, not specifically denying the fact in question, and in any event citing record evidence that does not actually controvert the fact in question].)

[28]    (*Compare* Dkt. No. 71, Attach. 2, at ¶ 18 [Defs.' Rule 7.1 Statement, asserting fact and supporting assertion with accurate record citations] *with* Dkt. No. 73, Attach. 1, at ¶ 18 [Plf.'s Rule 7.1 Response, admitting fact then improperly attempting to "add" additional facts, which belong in a *separate* statement of "additional material facts that the non-movant contends are in dispute," pursuant to N.D.N.Y. L.R. 7.1(a)(3)].)

[29]    (*Compare* Dkt. No. 71, Attach. 2, at ¶ 18 [Defs.' Rule 7.1 Statement, citing record evidence that establishes the fact in question] *with* Dkt. No. 73, Attach. 1, at ¶ 18 [Plf.'s Rule 7.1 Response, citing record evidence that does not actually controvert the fact in question].)

[30]    (*Compare* Dkt. No. 71, Attach. 2, at ¶ 21 [Defs.' Rule 7.1 Statement, citing record evidence that establishes the fact in question] *with* Dkt. No. 73, Attach. 1, at ¶ 21 [Plf.'s Rule 7.1 Response, not specifically disputing the fact in question, and in any event citing record evidence that actually supports the fact in question].)

inter alia, that the excised tissue was "partially submuscular," but constituted a "benign-appearing lipoma."[31]

After surgery, Dr. Beyer sent the excised tissue to be examined by a pathologist.   On or about September 29, 2009, a pathologist at Albany Medical Center examined the tissue sample which had been excised, and sent, by Dr. Beyer. The pathologist issued a report describing his findings as follows:

> The specimen is labeled lipoma right scapula. Received in formalin is a 120 gram, 10 x 7.9 x 2.9 cm well circumscribed portion of tan-yellow fibrofatty tissue. The external surface is inked and the specimen is serially sectioned revealing an unremarkable fatty cut surface. No discrete masses or areas of hemorrhage or necrosis are noted.

### D.    Measurement of Size of Plaintiff's Lipoma During Time in Question

In November of 2007, Dr. Floresca recorded that Plaintiff's lipoma was approximately three inches (or approximately 7.62 centimeters) in diameter. In March of 2008, Dr. Zamilus measured Plaintiff's lipoma and recorded that it was approximately 10 x 8 centimeters in size.  In September of 2008, Dr. Zamilus measured Plaintiff's lipoma and recorded that it was approximately 10 x 10 x 3 centimeters in size.  Again, in September of 2009, a pathologist measured Plaintiff's lipoma to be 10 x 7.9 x 2.9 centimeters in size.

During Plaintiff's encounters with Dr. Zamilus, he complained that his lipoma was getting bigger.[32]  However, Dr. Zamilus did not observe Plaintiff's lipoma getting much bigger;

---

[31]    (*Compare* Dkt. No. 71, Attach. 2, at ¶ 21 [Defs.' Rule 7.1 Statement, citing record evidence that establishes the fact in question] *with* Dkt. No. 73, Attach. 1, at ¶ 21 [Plf.'s Rule 7.1 Response, either asserting the fact in question or citing record evidence that supports the fact in question].)

[32]    (*Compare* Dkt. No. 71, Attach. 2, at ¶ 26 [Defs.' Rule 7.1 Statement, asserting fact in question and citing record evidence that establishes the fact in question] *with* Dkt. No. 73, Attach. 1, at ¶ 26 [Plf.'s Rule 7.1 Response, not specifically disputing the fact in question].)

rather, the lipoma appeared to Dr. Zamilus to be pretty much staying about the same size.[33]

During the occasions that Dr. Zamilus sought to identify the size of Plaintiff's lipoma by using a ruler obtain three-dimensional measurements of the growth, he may have touched the growth with the ruler.[34]  However, he does not recall Plaintiff indicated any pain during those procedures.[35]

### E.    Opinions of Dr. Wright and Plaintiff's Expert

Based on his medical experience, Dr. Wright believes that it is possible that a lipoma could cause pain while one is lying on one's back if the lipoma were pushing against a nerve, but that sleeping on one's back is not an activity of daily living if one can sleep on one's side or stomach instead.[36]

Plaintiff's noticed expert witness, Dr. Robert Aldoroty, MD, has never met or examined Plaintiff, and has no direct knowledge of Plaintiff's physical condition during the relevant time period.

---

[33]    (*Compare* Dkt. No. 71, Attach. 2, at ¶ 26 [Defs.' Rule 7.1 Statement, citing record evidence that establishes the fact in question] *with* Dkt. No. 73, Attach. 1, at ¶ 26 [Plf.'s Rule 7.1 Response, not citing record evidence that disputes the fact in question but that actually supports the fact in question].)

[34]    (*Compare* Dkt. No. 71, Attach. 2, at ¶ 27 [Defs.' Rule 7.1 Statement, citing record evidence that establishes the fact in question] *with* Dkt. No. 73, Attach. 1, at ¶ 27 [Plf.'s Rule 7.1 Response, citing record evidence that establishes the fact in question].)

[35]    (*Compare* Dkt. No. 71, Attach. 2, at ¶ 27 [Defs.' Rule 7.1 Statement, stating fact in question citing record evidence that establishes the fact in question] *with* Dkt. No. 73, Attach. 1, at ¶ 27 [Plf.'s Rule 7.1 Response, not specifically controverting fact in question, and in any event not citing record evidence that controverts the fact in question].)

[36]    (*Compare* Dkt. No. 71, Attach. 2, at ¶ 14 [Defs.' Rule 7.1 Statement, citing record evidence that establishes the fact in question] *with* Dkt. No. 73, Attach. 1, at ¶ 14 [Plf.'s Rule 7.1 Response, citing record evidence that establishes the fact in question].)

**F.      Nature of Claims Remaining in this Action**

In this action there is no claim involving any residual effects of his lipoma in the

aftermath of his surgery of September 25, 2009.[37] On January 27, 2012 the parties agreed as

follows:

> IT IS HEREBY STIPULATED AND AGREED, by and between the
> undersigned, attorneys of record for the parties in the referenced matter, that the
> plaintiff and his attorneys are unaware of any evidence, from a witness or any
> other source, which would demonstrate the existence of any physical impairment,
> disfigurement, pain, psychological/emotional trauma or other relevant current,
> ongoing or future condition arising out of the treatment rendered to the plaintiff's
> benign fatty lipoma after its surgical excision on September 25, 2009.
> IT IS THEREFORE STIPULATED AND AGREED, that any claims by the
> plaintiff based upon residual effects following the September 25, 2009 surgical
> procedure be and the same hereby are, discontinued with prejudice.[38]

**IV.      ANALYSIS**

After carefully considering the matter, the Court agrees that summary judgment should

be entered in Defendants' favor for the third and fourth reasons offered by Defendants in their

memorandum of law in chief and reply letter-brief: (1) based on the current record, no rational

fact finder could conclude that Defendants acted with a sufficiently culpable mental state to be

liable under the Eighth Amendment; and (2) in any event, based on the current record,

Defendants are protected from liability as a matter of law by the doctrine of qualified immunity.

(*See, supra,* Parts I.C.1. and I.C.3. of this Decision and Order [describing those reasons in more

detail]; *see also* Dkt. No. 71, Attach. 1, at 12-19 [attaching pages "12" through "19" of Defs.'

---

[37]      (*Compare* Dkt. No. 71, Attach. 2, at ¶ 28 [Defs.' Rule 7.1 Statement, asserting
fact and supporting assertion with accurate record citations] *with* Dkt. No. 73, Attach. 1, at ¶ 28
[Plf.'s Rule 7.1 Response, admitting fact then improperly attempting to "add" additional facts,
which belong in a *separate* statement of "additional material facts that the non-movant contends
are in dispute," pursuant to N.D.N.Y. L.R. 7.1(a)(3)].)

[38]      (*Id.*)

Memo. of Law]; Dkt. No. 74 [Defs.' Reply Letter-Brief].)[39]  The Court would add only the following analysis regarding Defendants' mental state and the doctrine of qualified immunity.

### A.     Additional Analysis Regarding Defendants' Mental State

In addition to being based on the analysis and case law offered by Defendants in their memorandum of law in chief and reply letter-brief, the Court's conclusion regarding Defendants' mental state is based on the following analysis.

The admissible record evidence before the Court clearly reveals as follows.  At some point between September 21, 2007, and November 8, 2007, Plaintiff first complained to correctional medical staff of pain from a lipoma below his right scapula.  During the next two years, Plaintiff repeatedly complained of pain from the lipoma.  More specifically, according to Plaintiff's medical records, he complained to medical staff of pain approximately 20 times.[40]

As a result, Plaintiff was repeatedly seen by correctional medical staff regarding his lipoma.  More specifically, according to Plaintiff's medical records, he was seen by correctional

---

[39]     The Court rejects Defendants' lack-of-personal-involvement argument and lack-of-serious-medical-need argument, generally for the reasons offered by Plaintiff in his opposition memorandum of law.  (*See, supra,* Part I.C.2. of this Decision and Order [summarizing those reasons].)

[40]     According to Plaintiff's medical records, he complained to medical staff of the following pain on the following 20 dates: "pain" at some point between November 1 and 9, 2007; "pain[]" on December 18, 2007; "pain[]" that "hurts real bad" (accompanied by the appearance of being in "great pain") on March 6, 2008; "pain" on March 21, 2008; "continued pain" (on a scale of 10 out of 10) on May 29, 2008; "pain" on June 26, 2008; "chronic . . . pain" on June 30, 2008; "pain" on July 7, 2008; "pain" on July 18, 2008; "pain" on July 28, 2008; "pain" on August 11, 2008; "pain" on September 4, 2008; "pain" on September 12, 2008; "pain" on September 25, 2008; "chronic . . . pain" on October 14, 2008; pain that "hurts" on October 20, 2008; "[increased] pain" on October 22, 2008; "pain" on January 22, 2009; "pain[]" on February 24, 2009; "pain" on July 30, 2009; continued "pain" (as well as concern of liver problems due to naproxen) on August 6, 2009.

medical staff regarding the lipoma approximately 29 times.[41]  Approximately 13 of those 29

times he was seen personally by one of several physicians.[42]  Medical staff reassured Plaintiff

that his lipoma was non-cancerous, and advised him that lipomas do not cause pain.

However, despite these facts, medical staff repeatedly provided Plaintiff with treatment

for his subjective complaints of pain relating to the lipoma.  More specifically, medical staff

provided Plaintiff with ibuprofen (for his complaints of pain relating to the lipoma)

approximately nine times–for at least 44 days–between approximately March 6, 2008, and

October 22, 2008.[43]  (It should be noted that, on various other occasions during that time period,

medical staff provided Plaintiff with pain relievers relating to his other conditions, e.g., dental

pain, sinus pain, fever, etc.)  Starting on October 22, 2008, medical staff provided Plaintiff

naproxen (for complaints of pain relating to his lipoma), which continued to be available to him

---

[41]     Plaintiff was seen regarding the lipoma on or about the following dates:
September 21, 2007; October 1, 2007; November 1, 2007; December 18, 2007; December 27,
2007; January 16, 2008; March 6, 2008; March 21, 2008; May 29, 2008; June 26, 2008; June 30,
2008; July 7, 2008; July 18, 2008; July 28, 2008; August 11, 2008; September 4, 2008;
September 12, 2008; September 25, 2008; October 14, 2008; October 20, 2008; October 22,
2008; January 22, 2009; February 24, 2009; July 30, 2009; August 6, 2009; August 24, 2009;
September 4, 2009; September 15, 2009; September 25, 2009.

[42]     Plaintiff was seen by a physician on or about at least the following dates
regarding his lipoma: October 1, 2007; November 1, 2007; December 18, 2007; December 27,
2007; March 21, 2008; July 18, 2008; September 12, 2008; October 22, 2008; October 24, 2008;
July 30, 2009; August 6, 2009; August 24, 2009; and September 25, 2009.

[43]     Plaintiff was provided ibuprofen for treatment for pain relating to his lipoma on or
about the following dates: March 6, 2008 (in ten packages); May 29, 2008 (for three days); June
30, 2008 (for three days); July 7, 2008 (for 12 days); July 28, 2008 (for three days); August 11,
2008 (in eight packages); and September 25, 2008 (for three days).  In addition, he was provided
an analgesic balm on or about June 26, 2008; and he was provided a warm compress on or about
October 22, 2008.

until August 6, 2009.[44]  On August 6, 2009, medical staff provided him the prescription-strength pain medication Feldene (when he reported that the naproxen was no longer effective).

Moreover, medical staff regularly kept track of the size of Plaintiff's lipoma, measuring it approximately 13 times, and noting that the lipoma–which originally measured approximately the size of a golf ball–initially more than doubled in size, and then appeared to fluctuate in size.[45]

On September 25, 2009, Plaintiff received surgery to remove the lipoma, because of the extremely remote chance that the lipoma could be cancerous, due to its increase in size.  During the surgery, while the lipoma was found to be partially submuscular, it was not found to be involved in any deep underlying structures, such as nerves.  Furthermore, the size was found to be, in fact, no greater than was measured in March of 2008.[46]  Finally, after the surgery, the lipoma was confirmed to be non-cancerous.

---

[44]     For example, the naproxen was available to Plaintiff at least on the following dates: January 22, 2009; February 24, 2009; July 30, 2009; and August 6, 2009.

[45]     More specifically, on or about October 1, 2007, the lipoma measured approximately 4 x 4 centimeters in size.  On or about November 1, 2007, the lipoma measured approximately 7.62 centimeters in diameter.  On or about November 2, 2007, the lipoma measured approximately 8 x 5 centimeters.  On or about December 19, 2008, the lipoma measured approximately 8 x 4 x 3 centimeters in size.  On or about December 27, 2007, the lipoma measured approximately 8 x 8.5 centimeters in size.  On or about March 21, 2008, the lipoma measured approximately 10 x 8 centimeters in size.  On or about September 12, 2008, the lipoma measured approximately 10 x 10 x 3 centimeters in size.  On or about October 22, 2008, the lipoma measured approximately 10 x 9 centimeters in size.  On or about February 26, 2009, the lipoma measured approximately 13 x 9 x 3 centimeters in size.  On or about October 22, 2008, the lipoma measured approximately 10 x 9 centimeters in size.  On or about July 30, 2009, the lipoma measured approximately 11 x 11 centimeters in size.  On or about August 6, 2009, the lipoma measured approximately 15 x 11 centimeters in size.  On or about September 25, 2009, the lipoma measured approximately 10 x 7.9 x 2.9 centimeters in size.

[46]     Specifically, on or about March 21, 2008, the lipoma measured approximately 10 x 8 centimeters in size.  On September 25, 2009, the lipoma measured approximately 10 x 7.9 x 2.9 centimeters in size.

The primary reason that Dr. Koenigsmann did not authorize Plaintiff's surgery between when he first became aware of Plaintiff's condition (on or about December 18, 2007) and when he ceased serving as the acting regional medical director of the hub in which Plaintiff was incarcerated (at some point before February 26, 2009) was that Dr. Koenigsmann did not credit as significant Plaintiff's subjective complaints of pain (and his resulting complaints of restricted movement and difficulty sleeping), based on the nature of a lipoma and the location of the lipoma.

More specifically, in reviewing the narratives from the consultation requests provided by Plaintiff's primary care providers,[47] Dr. Koenigsmann considered the following factors: (1) the nature of the lump (including the fact that, in and of itself, a lipoma does not cause pain, in part because it is made of fatty tissue, not nerves); (2) the physical features of the lump (e.g., consistency, coloration, variations, mobility); (3) any growth or change of size of the lump (including height), taking into account whether the measurements were taken by the same provider; (4) the location of the lump (e.g., whether it was located in a weigh-bearing area, or an area that would pose a mechanical problem, or an area in proximity to a nerve); and (5) reports of pain or discomfort (and whether the reports made sense in that the lump was located in a weight-bearing area or frequently traumatized area, or in proximity to a nerve). (Dkt. No. 72, Attach. 11, at 14-18, 25-26, 38, 40-45, 47, 50-52, 54, 66-68, 74, 78-79 [attaching first part of

---

[47]    Generally, Dr. Koenigsmann rendered his medical judgment that surgery was not warranted based on (1) his review of the narrative from the consultation request submitted by the inmate's primary care provider, and (2) the reason that DOCCS' vendor review agency, APS, felt it was not an appropriate consult. (Dkt. No. 72, Attach. 11, at 8-9, 14 [attaching first part of Koenigsmann Depo. Tr.].)

Koenigsmann Depo. Tr.].)[48]

In Dr. Koenigsmann's opinion, it was important to evaluate whether reports of pain or discomfort made sense because, in his experience, inmates often abuse reports of subjective pain for ulterior motives. (*Id*. at 15, 19, 53, 68.) Moreover, generally, Dr. Koenigsmann did not consider a lipoma overlaying one's should blade as a location that could mechanically cause pain. (*Id*. at 43-45, 52, 54.) Finally, Dr. Koenigsmann did not consider one's back to be a weight-bearing area because, generally, there is padding or cushioning in a bed, and one does not sleep exclusively on one's back. (*Id*. at 16-17, 25-26.)[49]

Similarly, the primary reason that Dr. Whalen did not authorize Plaintiff's surgery between when he first became aware of Plaintiff's condition (on or about February 26, 2009) and he was advised of possibility of a liposarcoma (on or about August 6, 2009) was that Dr. Whalen did not believe Plaintiff's subjective complaints of significant pain (and his resulting complaints of difficulty sleeping and restricted movement), based on the nature of a lipoma and the location of the lipoma.

More specifically, in evaluating Plaintiff's subjective complaints of pain, Dr. Whalen considered the following factors: (1) the nature of lipomas as, in and of themselves, non-painful (in part because they are made of fatty tissue, not nerves); (2) the location and size of the lipoma

---

[48]     Not only is the fact that Dr. Koenigsmann relied on the location of Plaintiff's lump supported by Dr. Koenigsmann's deposition testimony, it is supported by the medical records. (*See, e.g.,* Dkt. No. 72, Attach. 3, at 8 [attaching Referral Decision dated May 6, 2008, in which Dr. Koenigsmann wrote, "Lesion designated as lipoma, loc[ation] not likely to be painful. Do not see reason for surgery"].)

[49]     It should be remembered that, during his multiple examinations of Plaintiff at Mid-Orange Correctional Facility in 2008, Dr. Zamilus observed no vital signs (e.g., high blood pressure, elevated pulse) or appearance (e.g., facial expressions such as grimacing, etc.) supporting Plaintiff's complaints of pain regarding his lipoma. *See, supra,* Part III.A. of this Decision and Order.

in question (and whether it restricted Plaintiff's movement or encroached on a joint, nerve or other area); and (3) the extent to which any discomfort could be treated long term through pain medications such as naproxen.  (Dkt. No.  72, Attach. 7, at 25-29, 70-71, 75, 77-80, 107-08, 112-14, 117, 119, 128-29, 152 [attaching Whalen Depo. Tr.].)

In Dr. Whalen's opinion, the location of Plaintiff's lipoma was not indicative of pain, because, while the lipoma was located along the border of Plaintiff's scapula (near the spinal column), lipomas are superficial to underlying dermas, bones and organs.  (*Id*. at 78-79.) Moreover, in his opinion, pain while lying on one's back does not restrict movement (for purposes of deciding whether to authorize the surgical removal of a lipoma), because one can lie on one's side or stomach instead.  (*Id*. at 98-99, 120-21.)  As a result, in his opinion, Plaintiff was exaggerating the level of his pain and restricted movement (and sleep).  (*Id*. at 119, 123-24.) It should be remembered that Dr. Whalen knew Plaintiff was taking naproxen for his complaints of pain.  (*Id*. at 107.)[50]

Simply stated, rather than denying Plaintiff's requests for surgery for no medical reason, Defendants denied those requests for multiple medical reasons: the nature of the lump in question (which was inherently non-painful), and location of the lump in question (which was not sufficiently near a joint, nerve, weight-bearing area or other area to cause pain or restrict movement).  To adopt the rule requested by Plaintiff (i.e., that surgical is warranted merely upon the *subjective* complaint of pain or movement-interference by Plaintiff) would be to set aside

---

[50]     It should also be remembered that, during her multiple examinations of Plaintiff's medical records and her one examination of Plaintiff at Wallkill Correctional Facility in 2009, Dr. Susan Mueller, MD, observed no objective reason to believe that Plaintiff was in serious pain due to his lipoma.  *See, supra,* Part III.B. of this Decision and Order.

those medical reasons relied on by Defendants, and substitute the Court's medical judgment for Defendants' medical judgment.

Finally, a few words are appropriate regarding the role of DOCCS Policy 1.43 in the decisions rendered by Defendants. Plaintiff essentially argues that Defendants inflexibly applied and/or misunderstood Policy 1.43 as requiring the denial of a request for lipoma surgery based on pain and/or restriction in movement. Such an argument is unsupported by the record.

From any fair reading of the entire record, it is clear that neither Drs. Koenigsmann nor Whalen inflexibly applied Policy 1.43 as requiring a denial of a request for lipoma surgery based on pain and/or restriction in movement.[51] It is also clear that neither that Drs. Koenigsmann nor Whalen misunderstood DOCCS Policy 1.43 as requiring a denial of a request for lipoma surgery based on pain and/or restriction in movement; rather, both of them correctly understood that things such as pain and restriction in movement could constitute a "collateral symptom" justifying lipoma surgery under Policy 1.43.[52] Their denials simply resulted from the fact that,

---

[51]    (*See, e.g.,* Dkt. No. 72, Attach. 11, at 66-68 [attaching pages "66" through "68" of Koenigsmann Depo. Tr., stating that he considered Policy 1.43 as "a factor" when evaluating whether Plaintiff's lipoma should be surgically removed]; Dkt. No. 72, Attach. 7, at 149-53, 156 [attaching pages "149" through "153," and page "156," of Whalen Depo. Tr., stating that his medical judgment to deny a surgical consult request was "in accordance with" Policy 1.43, which did not contain an "exception" so as to permit surgery simply because a patient issued a *subjective* complaint of pain from the lipoma, but which did permit surgery if that complaint were accompanied by *objective* evidence, such as encroachment on a joint so as to cause pain].)

[52]    (*See, e.g.,* Dkt. No. 71, Attach. 6, at 1 [attaching copy of Policy 1.43(a), stating in pertinent part that lipomas are considered only as "prima facia" medically unnecessary and that, in any event, they are so considered only "absent the existence of collateral symptoms"]; Dkt. No. 72, Attach. 7, at 149-53, 156-57, 161, 163 [attaching pages "149," "150," "151," 152," "153," "156," "157," "161," and "163" of Whalen Depo. Tr., stating that that lipoma surgery was permissible under Policy 1.43 if there are any "collateral symptoms" such as "encroachment upon . . . a joint . . . that would cause . . . pain" or "restrictions on motion" based on the lipoma's "location," etc.]; Dkt. No. 72, Attach. 11, at 67-68 [attaching pages "67" and "68" of Koenigsmann Depo. Tr., stating that lipoma surgery was permissible under Policy 1.43 if there was a "very very specific reason [or justification] for it," such as "mechanical [interference]," a

based on the objective evidence (including the nature and location of the lipoma on Plaintiff's back), they found no such collateral symptoms.

For these reasons, this case is distinguishable from that of *Brock v. Wright*, which turned on the following two things: (1) the fact that prison doctors *inadequately understood* DOCCS Policy 1.43 (specifically, whether pain from a keloid scar on the plaintiff's face could constitute a "collateral symptom" under Policy 1.43); and (2) the fact that prison doctors cast doubt on the plaintiff's subjective complaints of pain from the keloid scar on his face *despite the existence of objective evidence corroborating that pain* (specifically, the fact that a "keloid scar could cause this sort of pain in the facial area"). *Brock v. Wright*, 315 F.3d 158, 166-67 (2d Cir. 2003).

This critical difference between lipomas and keloid scars–i.e., that lipomas cannot in and of themselves cause pain–appears to have been rather routinely relied on by district judges across the country in finding no deliberate indifference resulting from a sustained denial of surgery to remove a lipoma, despite a plaintiff's subjective (and otherwise-uncorroborated) complaints of pain.[53]  This has been the case even where the lipoma was located on an otherwise-sensitive part of the plaintiff's body,[54] and the surgery was denied for a period of time longer than was the

---

"suspicious" change in the consistency or growth of the lipoma, "legitimate . . . pain[]" that "ma[d]e sense" to him considering the lipoma's location, etc.].)

[53]    *See, e.g., Tucker v. Wisconsin Dept. of Corr.*, 06-CV-0066, 2006 WL 358566, at *2-5 (W.D. Wis. Feb. 15, 2006) (finding no deliberate indifference resulting from denial of surgery to remove multiple lipomas from plaintiff's back for a period of more than twenty-one months–between February 12, 2004, and November 15, 2005–despite plaintiff's subjective complaints of back pain, where he was consistently and frequently cared for and provided pain medication during that time period).

[54]    *See, e.g., Frye v. Anderson*, 09-CV-0025, 2009 WL 4549039, at *4-5, 8 (N.D. W.Va. Nov. 25, 2009) (finding no deliberate difference resulting in denial of surgery to remove grapefruit-sized lipoma from **lower part of plaintiff's neck** for period of **more than twelve months**–between February 9, 2006, and February 22, 2007–despite plaintiff's subjective complaints of pain, where he was closely monitored during that time period); *Whitehead v.*

surgery in this case.[55]

For all of these reasons, the Court finds that, contrary to Plaintiff's argument that Defendants not actually base their decisions on their medical judgments, the record is clear that they did base their decisions on their medical judgments, including but not limited to their judgments regarding the nature and location of the lipoma on Plaintiff's back.  It must be remembered that, while an error in those medical judgments may conceivably result in negligence, such an error cannot rationally be found to result in the sort of *criminally reckless* mental state necessary to impose liability on Drs. Koenigsmann, Whalen and Wright under the

---

*Mahone*, 10-CV-1027, 2011 WL 3241352, at *1-3, 7-8 (C.D.Ill. July 29, 2011) (finding no deliberate indifference resulting from denial of surgery to remove lipoma from ***back of plaintiff's head*** for period of ***more than nine months***–between April 21, 2009, and February 1, 2010–despite plaintiff's subjective complaints of painful headaches where he was examined repeatedly during that time period); *Abad v. Roff*, 07-CV-0405, 2008 WL 728928, at *1-2, & n.7 (W.D. Va. March 18, 2008) (finding no deliberate indifference resulting from denial of surgery to remove two lipomas from ***rear of plaintiff's scalp*** for period of ***approximately nine months***–between November 28, 2006, and August 2007–despite plaintiff's subjective complaints of constant pain in that area, where he was repeatedly evaluated and provided Tylenol and ibuprofen during the time in question), *aff'd on other grounds*, 280 F. App'x 254 (4th Cir. 2008); *Willie v. Vo*, 07-CV-0156, 2009 WL 2941471, at *1-4, 7 (E.D. Cal. Sept. 10, 2009) (finding no deliberate indifference to deny surgery to remove lemon-sized lipoma on his ***head*** for a period of ***approximately seven months***–between June 2006 and January 10, 2007–despite plaintiff's subjective complaints of painful headaches, where he was provided ibuprofen and regularly seen during that time period).

[55]      *See, e.g., Walker v. Aranas*, 11-CV-0080, 2012 WL 3230561, at *1-2, 4-5 (D. Nev. June 20, 2012) (finding no deliberate indifference resulting from denial of surgery to remove golf-ball-sized lipoma from ***back of plaintiff's head*** for period of ***nearly forty-five months***–between January 22, 2007, and October 11, 2010–despite plaintiff's subjective complaints of painful headaches, where he was examined and treated with pain medication during that time period), *adopted by*, 2012 WL 3230961 (D. Nev. Aug. 3, 2012); *Maddrie v. Parekh*, 06-CV-0566, 2008 WL 2608105, at *4-5 (M.D. Fla. July 1, 2008) (finding no deliberate indifference resulting from denial of surgery to remove one-inch-wide lipoma from ***back of plaintiff's neck*** for period of ***more than thirty-two months***–between January 11, 2005, and September 18, 2007–despite plaintiff's subjective complaints of pain and stiffness, where he was evaluated and provided with Tylenol and ibuprofen on numerous occasions during that time period), *appeal dismissed as frivolous*, No. 08-14362G, Order (11th Cir. filed Dec. 31. 2008).

Eighth Amendment.[56]  *At most*, this was a case of a delay in treatment due to a bad diagnosis, which is not actionable under the Eighth Amendment.  *See Harrison v. Barkley*, 219 F.3d 132, 139 (2nd Cir. 2000) ("[A] a delay in treatment based on a bad diagnosis or erroneous calculus of risks and costs, or a mistaken decision not to treat based on an erroneous view that the condition is . . . trivial or . . . will not constitute deliberate indifference.").   As the Second Circuit has explained,

> It must be remembered that the State is not constitutionally obligated, much as it may be desired by inmates, to construct a perfect plan for [medical] care that exceeds what the average reasonable person would expect or avail herself of in life outside the prison walls.  [A] correctional facility is not a health spa, but a prison in which convicted felons are incarcerated.  Common experience indicates that the great majority of prisoners would not in freedom or on parole enjoy the excellence in [medical] care which plaintiff[] understandably seeks . . . .  We are governed by the principle that the objective is not to impose upon a state prison a model system of [medical] care beyond average needs but to provide the minimum level of [medical] care required by the Constitution. . . .  The Constitution does not command that inmates be given the kind of medical attention that judges would wish to have for themselves . . . .

---

56      "[D]eliberate indifference describes a state of mind more blameworthy than negligence."  *Farmer v. Brennan*, 511 U.S. 825, 835 (1994) ("[D]eliberate indifference [for purposes of an Eighth Amendment claim] describes a state of mind more blameworthy than negligence."); *Estelle v. Gamble*, 429 U.S. 97, 106 (1976) ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.  Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.").  Rather, deliberate indifference is a state of mind akin to *criminal recklessness*.  *Farmer,* 511 U.S. at 827 ("[S]ubjective recklessness as used in the criminal law is a familiar and workable standard that is consistent with the Cruel and Unusual Punishments Clause as interpreted in our cases, and we adopt it as the test for 'deliberate indifference' under the Eighth Amendment."); *Hemmings v. Gorczyk*, 134 F.3d 104, 108 (2d Cir. 1998) ("The required state of mind [for a deliberate indifference claim under the Eighth Amendment], equivalent to criminal recklessness, is that the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists; and he must also draw the inference.") [internal quotation marks and citations omitted]; *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996) ("The subjective element requires a state of mind that is the equivalent of criminal recklessness . . . .") [citation omitted].

*Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986) [internal quotations and citations omitted].

Finally, the Court also finds that, contrary to Plaintiff's argument that Drs. Koenigsmann, Whalen and Wright inflexibly applied and/or misunderstood Policy 1.43 as requiring the denial of a request for lipoma surgery based on pain and/or restriction in movement, the record is clear that they correctly understood and applied that policy, which permitted surgery if the subjective complaints of pain and/or restriction in movement were accompanied by objective evidence corroborating those complaints.

### B. Additional Analysis Regarding the Doctrine of Qualified Immunity

In addition to being based on the analysis and case law offered by Defendants in their memorandum of law in chief and reply letter-brief, the Court's conclusion regarding the doctrine of qualified immunity is based on the following two points.

First, the Court rejects Plaintiff's qualified-immunity argument that *Brock v. Wright* clearly established the unconstitutionality of Defendants' actions.  *See, supra,* Part I.C.2. of this Decision and Order.   That case is distinguishable from this case for each of the two reasons described above in Part IV.A. of this Decision and Order.  The Court would add only that it has discovered no case interpreting *Brock v. Wright* as abrogating the rule in the Second Circuit that subjective complaints of pain alone (i.e., uncorroborated by objective evidence) do not constitute a sufficiently serious medical need under the Eighth Amendment (which, after all, is an *objective* element of the relevant standard).[57]

---

[57]        *See, e.g., McQueen v. Cnty. of Albany,* 08-CV-0799, 2010 WL 338081, at *11 (N.D.N.Y. Jan. 28, 2010) (Report-Recommendation of Peebles, M.J., adopted by Hurd, J.) (""[T]he record leads invariably to the conclusion that plaintiff's hernia is not objectively sufficient to qualify as constitutionally significant. . . .  Plaintiff's subjective complaints of pain are not substantiated by any objective evidence . . . ."); *Paterson v. Goord,* 06-CV-0211, 2008 WL 623123, at *8 (N.D.N.Y. March 4, 2008) (Report-Recommendation of Lowe, M.J., adopted by Mordue, C.J.) ("[A] plaintiff's subjective complaints of pain do not, in and of themselves, constitute factual allegations plausibly suggesting the existence of a serious medical need."); *Kee*

Second, the Court also rejects Plaintiff's qualified-immunity argument that Defendants were not objectively reasonable in repeatedly disregarding Plaintiff's complaints of pain without physically examining him or reviewing his medical records (other than the narratives from the consultation requests, and any attached photographs, submitted by Plaintiff's primary care providers). *See, supra,* Part I.C.2. of this Decision and Order. As an initial matter, Plaintiff's desired rule would appear to impose on every administrative physician the same duties of plenary-record-review and personal-examination that are imposed on a primary care provider (effectively eliminating the position of an administrative physician). Such a rule would appear to conflict with the governing case law, which generally permits a prison administrator (including an administrative physician) to rely on the findings of a subordinate (including a primary care provider), unless the administrator has reason to believe that the subordinate is incompetent or otherwise unreliable.[58] Here, Drs. Koenigsmann and Whalen reviewed, and were

---

*v. Hasty,* 01-CV-2123, 2004 WL 807071, at *22 (S.D.N.Y. Apr. 14, 2004) ("Kee's bare allegations of . . . physical 'pain' are, without more, insufficient to satisfy the stringent standard for pleading a serious injury."), *adopted*, Order (S.D.N.Y. filed April 1, 2005) (Wood, J.); *Thomas v. Nassau Cnty. Corr. Ctr.,* 288 F. Supp.2d 333, 338 (E.D.N.Y. 2003) ("Subjective complaints of pain are not sufficient to satisfy this standard."); *Arroyo v. City of New York*, 99-CV-1458, 2003 WL 22211500, at *1 (S.D.N.Y. Sept. 25, 2003) ("Subjective complaints of pain are not sufficient to satisfy this standard."); *Espinal v. Coughlin*, 98-CV-2579, 2002 U.S. Dist. LEXIS 20, at *8-9 (S.D.N.Y. Jan. 2, 2002) ("[Plaintiff's] complaint of extreme pain . . . does not meet the standard under the Eighth Amendment. Complaints of pain are subjective criteria not objective criteria upon which a medical practitioner has to rely in decisions for treatment."); *Chatin v. Artuz*, 95-CV-7994, 1999 WL 587885, at *3 (S.D.N.Y. Aug. 4, 1999) ("Chatin's alleged problems in his right foot may indeed be very real. His pain is not, however, of the type contemplated for satisfaction of the objective standard set forth above."), *aff'd*, 28 F. App'x 9 (2d Cir. 2002).

[58]     *Vega v. Artus*, 610 F. Supp.2d 185, 199, n.13 (N.D.N.Y.2009) (Suddaby, J.) (collecting cases); *see, e.g., Lewis v. Cunningham*, 05-CV-9234, 2011 WL 1219287, at *5, 7 (S.D.N.Y. March 14, 2011) ("[P]rison administrators [such as the DOCS Chief Medical Officer, Dr. Lester Wright] may defer to medical staff regarding medical treatment of inmates. . . . [Wright] may rely on front-line medical staff . . . ."), *adopted by*, 2011 WL 1218061 (S.D.N.Y. March 30, 2011), *aff'd*, 483 F. App'x 617 (2nd Cir. 2012); *cf. Kellner v. First Unum Life Ins.*

entitled to rely on, the narratives from the consultation requests from Plaintiff's primary care providers.

Even if the imposition of such a duty were reasonable, Plaintiff has adduced no admissible record evidence establishing that, had the three Defendants in this case reviewed all of Plaintiff's medical records and personally examined him, they would have reached a conclusion other than the conclusion they reached. *See Vonhagn v. Corning Inc.*, 590 F. Supp.2d 418, 422 (W.D.N.Y. 2008) ("[P]laintiff offers no evidence that additional physical examinations would have yielded additional objective findings that would support a conclusion that she was disabled."). Indeed, to the contrary, in their depositions, Defendants consistently held firm to their conclusion that, despite the existence of Plaintiff's repeated subjective complaints of pain, no objective evidence exists corroborating those complaints sufficient to warrant surgical intervention.

For all of these reasons, the Court finds that, at the very least, Defendants are protected from liability as a matter of law by the doctrine of qualified immunity.

**ACCORDINGLY**, it is

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 71) is **<u>GRANTED</u>**; and it is further

**ORDERED** that Plaintiff's Second Amended Complaint (Dkt. No. 67) is **<u>DISMISSED</u>**.

Dated: January 14, 2013
    Syracuse, New York

Hon. Glenn T. Suddaby
U.S. District Judge

---

*Co.*, 589 F. Supp.2d 291, 308 (S.D.N.Y.2008) (explaining that "acceptance of [P]laintiff's subjective complaints of pain is by no means required of the [ERISA] administrator," and finding that the plan administrator is "entitled to rely on its independent medical reviewers' opinions regarding the medical records in [Plaintiff's] claim file; no 'in-person, physical examination of [Plaintiff]' was necessary") (internal quotation marks and citations omitted).